LEOPOLD BOLLERMANN AND JOHN B. BOLLERMANN, RESPONDENTS, *v.* CHARLES H. BLAKE, APPELLANT.

*Legitimacy — children born out of wedlock cannot by being legitimated by the law of another country acquire the right to hold real estate in this State — Inference of marriage — Treaty.*

March 18, 1807, Charles Anton Bollermann was born at Mainz, in the Grand Duchy of Hesse, of parents who were residents and subjects thereof. In February, 1843, his parents were married at that place, in accordance with the provisions of the laws of that place, and there signed and executed a certificate declaring "that they had already engendered together the following children," naming them, "which children they hereby duly acknowledged and legitimated." By the laws of the said Grand Duchy, children so legitimated enjoy the same rights as if they were born in wedlock. There was no proof of any actual former marriage between the parties, nor was any evidence given to show whether the parents had lived together as husband and wife, or were reputed to be married, or that the children had been baptised or had been regarded as legitimate by their parents or by strangers.

In an action of ejectment involving the title to real estate in this State, of which Charles Anton Bollermann, who was at the time of his death a citizen thereof, died seized.

*Held,* that the question whether or not Bollermann was legitimate or illegitimate was to be determined by the laws of this State. That the term illegitimate, as used in the statute of descents of this State, means a child begotten and born out of wedlock. That the circumstances proved in this case were not only insufficient to authorize the inference of a marriage of Bollermann's parents prior to his birth, but disproved the existence of any such prior marriage. That Bollermann was illegitimate and the real estate descended to his relatives on the part of his mother.

Bollermann died May 18, 1866, leaving as his heirs-at-law two brothers and a sister, all non-resident aliens. In 1845 a convention was made between the United States of America and the Grand Duchy of Hesse "for the mutual abolition of the *droit d'aubaine* and taxes on emigrants." By article one thereof, every kind of *droit d'aubaine* was abolished, and article two provided that where a citizen of either country would be entitled to inherit real estate, were he not disqualified by alienage, he should be allowed a term of two years to sell the same and withdraw the proceeds thereof without molestation. In April, 1868, the legislature, by chapter 433 of 1868, released all the estate and interest of the State of New York in the real estate in question to the heirs-at-law of Bollermann. In November, 1868, the alien heirs-at-law conveyed the land to the defendant.

*Held,* that under the convention made in 1845, the real estate vested upon Bollermann's death in his alien heirs-at-law, subject to be divested upon their failure to sell the same within the two years.

That the passage of the act of 1868 removed this condition and vested the estate absolutely in them.

APPEAL from a judgment in favor of the plaintiffs, entered upon the trial of this action by the court without a jury. March 18, 1807, Charles Anton Bollermann was born at Mainz, in the Grand Duchy of Hesse, of parents who were residents and subjects thereof. In February, 1843, his parents were married at that place, in accordance with the provisions of the laws of that place, and there signed and executed a certificate declaring "that they had already engendered together the following children," naming them, "which children they hereby duly acknowledged and legitimated." By the laws of the said Grand Duchy, children so legitimated enjoy the same rights as if they were born in wedlock. There was no proof of any actual former marriage between the parties, nor was any evidence given to show whether the parents had lived together as husband and wife, or were reputed to be married, or that the children had been baptised or had been regarded as legitimate by their parents or by strangers. This was an action of ejectment brought by the plaintiffs, naturalized citizens, who claimed to be third cousins of one Charles Anton Bollermann, who died intestate and seized of the premises on May 18, 1866. He left him surviving two brothers and one sister, all of whom were and continued to be subjects of. the Grand Duke of Hesse. One of the brothers, Joseph, died intestate in November, 1866, leaving his brother and sister his heirs-at-law, under conveyance from whom the defendant claimed. The question was whether Charles was illegitimate, in which case the inheritance passed to his mother's relatives; or legitimate, in which case the plaintiffs claimed to be entitled.

*F. R. Coudert*, for the appellant.

*H. A. Nelson*, *A. N. Wheeler* and *S. F. Prentiss*, for the respondents.

GILBERT, J. :

The statute of descents of this State provides that "in case of the death, without descendants, of an intestate who shall have been illegitimate, the inheritance shall descend to his mother; if she be dead, it shall descend to the relatives of the intestate on the part of the mother as if the intestate had been legitimate." (1 R. S., 753, § 14.) The term "illegitimate," as used in this statute, means a

child begotten and born out of wedlock. (*Miller* v. *Miller*, 18 Hun, 507, and authorities cited.) Charles Bollermann, a born subject of the Grand Duchy of Hesse, but a naturalized citizen of the United States, died seized of the lands in dispute, intestate and without descendants. The plaintiffs claim the lands by descent as collateral heirs of the intestate, but they are not of the blood of the intestate's mother. The only relatives left by the intestate on the part of his mother were his brothers and a sister, under whom the defendant claims title, and they (the brothers and sister) were aliens. If, therefore, the intestate was illegitimate, the plaintiffs cannot be his heirs, for the reason that they are not his relatives on the part of his mother, and the only relatives of that description being aliens, the lands, but for the treaty hereinafter mentioned, would have escheated to the people. (1 R. S., 718, § 1.)

The court below decided that Charles Bollermann was born in wedlock, and the first question is whether the evidence warranted that decision. The only marriage between the parents of Charles of which there is any evidence occurred thirty-six years after his birth. It is conceded by the defendant that such marriage, according to the law of the domicile of the parents, where they were married, conferred upon Charles the personal status of legitimacy. No doubt that is correct. But it is a rule of the common law, with respect to the descent of real property, that the personal status of legitimacy acquired under foreign laws does not confer the right of inheritance. I cannot find any statute which changes that rule. The common law, in some cases, adopts the law of the country where a marriage occurred in determining the validity of the marriage contract; the distribution of personal property also is governed by the law of the domicile of the intestate, but the *lex loci* alone is applicable to the inheritance of real property. (1 R. S., 753, § 16; 4 Kent Com., 67, §§ 1, 8, note; *Birtwhistle* v. *Vardill*, 7 Cl. & Fin., 895–925.) In the case last cited it was held by the House of Lords in England to be a rule or maxim of the common law, with respect to the descent of land from father to son, that the son must be born after actual marriage; that such rule was *juris positivi*, annexed to the land itself, and could not be affected by a foreign law whereby the personal status as to legitimacy was conferred. This case also furnishes an answer to the criticism of the counsel for the plaintiffs

that the rule stated was introduced by the statute of Merton, and the case shows that the reverse is the fact. That statute contains a declaration against a proposed innovation upon the common law whereby a child born out of wedlock might be legitimated by a subsequent marriage. (See 1 Ev. Stat., 168 ; 1 Reeve Hist. English Law, by Finlason, 299.) The act of 1828, which put an end to the operation of British statutes in this State, therefore, had no effect upon the rule of the common law above referred to. In the recent case of *Miller* v. *Miller* (*supra*) the point now under discussion received an elaborate consideration, and the court decided that the rule of the common law, as above stated, was still in force in this State. If we had any doubt upon the subject, that decision ought, upon the principle *stare decisis*, to be regarded as controlling until reversed.

The only evidence relied on to sustain the finding that the intestate was born in wedlock, consists of declarations of his parents contained in the official record of their marriage, which occurred thirty-six years after the intestate was born, namely : that they had engendered together seven children, whose names and the dates of whose births were given, and that they thereby acknowledged and legitimated said children. Upon these facts, and upon a supposed presumption in favor of legitimacy, the court below drew the inference that there had been a prior unceremonial marriage between the parents of the intestate, and that such prior marriage occurred before their eldest child was born. The fact that the parents had engendered together seven children, of whom the intestate was one, especially when accompanied by evidence that the parents were afterwards married, does not warrant the inference that the children were born in wedlock, and such an inference is repelled by the declaration of the parents, made simultaneously with their marriage, that they acknowledged and legitimated the children. For if the children were born in wedlock, what need or propriety was there of any acknowledgment or legitimation of them ? Cohabitation as husband and wife in the absence of repelling circumstances may justify the inference that the parties so living together had been married, and that the offspring of such marriage are legitimate. But the engendering of children alone, even though they were born after the usual intervals, without some evidence that the parents

had previously lived together, or had been reputed to be married, or that they had held themselves out as married persons, furnishes no basis for a presumption of the marriage of the parents or of the legitimacy of the children. We cannot presume a marriage without proof, and from that alone presume the legitimacy of the children, or *vice versa*. One presumption will not aid the other. More especially is that the case when the object of the evidence is to prove a descent cast upon collateral heirs. The plaintiffs could maintain this action only by proving the descent of themselves and the person last seized from a common ancestor. As an illegitimate child can neither take nor transmit an inheritance except in the cases provided by the statute of descents before mentioned, it was incumbent on the plaintiffs to prove an actual marriage of the parents of the intestate before he was born. No such proof was given. Nor was any evidence offered of the existence of the usual family relations between the parents of the intestate and their children, or whether the parents were reputed to be married, or whether they ever lived together or in what manner they lived; or that their children had been baptized, or that the latter had ever been regarded by their parents or by strangers as legitimate before the formal marriage which occurred twenty-seven years after the youngest child was born. Without evidence of such or similar circumstances or direct evidence, a marriage cannot be proved; and when a formal marriage occurring after the birth of children is proved, accompanied by the declarations in the record thereof before referred to, and such record contains no allusion to a prior marriage, we think that the existence of such prior marriage is disproved. No doubt the mere fact that persons have been formally married is not sufficient to overcome proof of a prior informal marriage. But it is sufficient to repel an inference of such prior marriage from the birth of children only. The marriage relation rests upon present mutual consent. Cohabitation does not constitute marriage. It is merely evidence of it. But the birth of children may occur without such cohabitation. Hence, taking all the facts proved in this case, it is impossible to determine whether the parents of the intestate cohabited or not as husband and wife. The only legitimate inference, from the fact of the actual formal marriage of the parents long after the birth of their

children, is that no prior marriage of the parents ever occurred. If there had been a prior marriage there was not a shadow of ground for having a second marriage. On the contrary, as before intimated, the acts of formally acknowledging and legitimating the children were useless and inappropriate, except for the purpose of giving them that which they did not before possess, namely, the personal *status* of legitimacy. We have examined the authorities cited on behalf of the plaintiffs. None of them countenance the idea that a marriage of parents or the legitimacy of children can, in a case of this kind, be established by presumption alone, without proof of such circumstances as tend to show that there had been that mutual interchange of consent which is requisite to constitute a valid marriage.

The brothers and sister of the intestate were his nearest relatives, and his only relatives on the part of his mother. Their alienage impeded their succession to the inheritance. The plaintiffs thus became the next collateral relatives. But the intestate being illegitimate, the plaintiffs, as already shown, were excluded from the inheritance, and the intestate's brothers and sister, irrespective of the treaty between the United States and the Grand Duchy of Hesse, which will be noticed presently, were also excluded from the inheritance because they were aliens. Such facts, therefore, show a total failure of heirs, and if there were no other facts they would also show that the lands had escheated to the people of the State.

By virtue of the act of April 28, 1868, the legislature authorized the persons who would be heirs-at-law of the intestate, but for the disqualification of alienage, to take and hold the lands and released to them all the estate, right, title and interest of the people therein. The defendant holds under a conveyance made by a surviving brother and the sister. They are persons who are designated in the act, and we are of opinion that the intestate being illegitimate the defendant, by virtue of the grant from the brother and sister, acquired a valid title.

Upon the supposition, however, that the intestate was legitimate, the question arises whether the effect of the treaty referred to was to relieve his brothers and sister from the incapacity to take lands arising from their alienage. The treaty is a part of the supreme

law of the land. The first article abolishes every kind of *droit d'aubaine* between the two contracting parties, their States, citizens and subjects. The term *droit d'aubaine* includes escheats and the causes thereof. (Lawrence's Wheat. Int. Law, 166.) It is immaterial to inquire what else it includes, as the State has released any right of escheat which it had. The second article of the treaty provides that "where, on the death of any person holding real property within the territories of one party, such real property would descend on a subject or citizen of the other, were he not disqualified by alienage, such citizen or subject shall be allowed a term of two years to sell the same, which term may be reasonably prolonged according to circumstances." Article third relates to personal property. The fourth article provides that "in case of the absence of the heirs, the same care shall be taken provisionally of such real and personal property as would be taken in a like case of property belonging to the natives of the country, until the lawful owner, or the person who has a right to sell the same according to article second, may take measures to recover or dispose of the inheritance." We are clearly of opinion that these provisions removed from the brothers and sister of the intestate the disqualification of their alienage. A power thus conferred by law upon aliens to sell lands, the only impediment to their complete ownership of which is their alienage, necessarily implies a power to convey the whole estate therein. For they could not exhaust the power except by selling all their estate in the lands, nor unless they made such a conveyance as would transmute the title thereto. In short a sale is nothing more or less than a transfer of ownership. The fourth article of the treaty treats the right conferred by the second article as a receiving or disposing of the inheritance. No doubt the intent was to confer the power to take and hold lands. Any other construction would frustrate the treaty. An authority to sell lands and appropriate the proceeds of the sale is equivalent to a grant of the ownership thereof. (See 1 R. S., 732, §§ 81–85.) Nor can a man sell lands which he was incapable of taking and holding. The limitation of two years in the second article has ceased to be of any importance, for the reason that before the expiration of that period the legislature of this State passed the act referred to, whereby the grantors

under whom the defendant holds were expressly authorized to take, hold, sell and convey the lands in controversy. The intestate died May 15, 1866, and the act was passed April 28, 1868. Surely no greater effect should be given to the limitation of two years than would be given to a condition of the like import. In that view of the subject the disqualification of alienage was removed by the treaty-making power, upon condition that the property should be sold within two years from the death of the intestate. Before the expiration of that period, however, the State which imposed the disqualification, in the exercise of a co-ordinate power over this subject, abolished that disqualification. The condition that the land should be sold within a limited period was thus changed into a power to take and hold the land without any condition whatever. Upon the death of the intestate therefore, the estate vested in his brothers and sister, subject, however, to the contingency of being divested by a non-performance of the condition. But the removal of their disqualification to take and hold lands before the time limited for the performance of the condition, dispensed with the performance thereof and at once vested the estate absolutely in them. (*Hall* v. *Hall*, Ct. of Appeals, MSS.)

In no point of view, therefore, were the plaintiffs entitled to recover. On the contrary, we are of opinion that the defendant established a title in himself.

The judgment must be reversed and a new trial granted, with costs to abide the event.

Present — BARNARD, P. J., GILBERT and DYKMAN, JJ.

Judgment reversed and new trial granted, costs to above event.